IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2020

**IN RE EDWARD R.**

**Appeal from the Juvenile Court for Maury County**
**No. 18-JV-123     Douglas K. Chapman, Judge**
_____

**No. M2019-01263-COA-R3-PT**
_____

This appeal involves the termination of a mother's parental rights to two children. The trial court found by clear and convincing evidence that four grounds for termination had been proven and that it was in the best interest of the children to terminate Mother's parental rights. Mother appeals. For the following reasons, we reverse the trial court's ruling on two grounds for termination but otherwise affirm the order terminating Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part, Affirmed in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S. joined and KRISTI M. DAVIS, J., filed a separate concurrence and partial dissent.

Shawn D. Snyder, Columbia, Tennessee, for the appellant, Amber R.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.  FACTS & PROCEDURAL HISTORY**

This appeal involves a single mother and her parental rights to two of the eight children she had at the time of trial. Amber R. ("Mother") has been battling drug addiction and mental health issues for years. One of her children died as an infant, and Mother does not have custody of any of her other children.

This appeal involves her two sons Edward and Nathaniel. Edward was born in March 2016 and initially remained in Mother's custody. Nathaniel was born in April 2017. Child Protective Services became involved because it was reported that Mother tested positive for amphetamines, benzodiazepines, marijuana, and opiates when she was admitted to the hospital to give birth to Nathaniel. Tests showed that he had been exposed to amphetamines and marijuana in utero. He experienced withdrawal symptoms after birth. Reportedly, Mother admitted to the CPS investigator that she had used morphine for pain, Xanax for anxiety, and Adderall without prescriptions. Mother's sister reportedly told the investigator that Mother had unresolved mental health issues stemming from the loss of an infant about five years earlier.

Child Protective Services ("CPS") continued to work with Mother after Nathaniel's birth, but on June 15, 2017, Mother tested positive for methamphetamine, amphetamines, THC, and Oxycodone. On June 21, 2017, the Tennessee Department of Children's Services ("DCS") filed a petition to transfer temporary legal custody of Edward and Nathaniel to Mother's sister. The petition alleged that the children were dependent and neglected. It described CPS's involvement with Mother since Nathaniel's birth and the results of her drug screens. According to the petition, CPS had referred Mother for an alcohol and drug assessment, counseling, and in-home services due to Nathaniel's prematurity and drug exposure. The petition alleged that Mother's sister was residing in the home with Mother and the alleged biological father, and that the maternal aunt was a fit and proper person to have custody of the children. On June 26, 2017, the juvenile court entered an order bringing the children into the protective jurisdiction of the court and finding that Mother's sister was fit and capable of assuming custody. The order provided that Mother's sister was to supervise all contact between Mother and the children.

Less than a month later, on July 21, 2017, DCS filed a petition seeking temporary legal custody of the children. The petition again alleged that the children were dependent and neglected. According to the petition, Mother's sister had moved out of the residence and was not fit to care for the children. The juvenile court entered an ex parte protective custody order awarding temporary legal custody of the children to DCS. The children were placed in a foster home that same day. On August 7, 2017, the juvenile court entered a final order finding the children dependent and neglected as alleged in the petition. Temporary legal custody was to remain with DCS.

On August 10, 2017, a child and family team meeting was held for the development of a family permanency plan. Edward was one year old and Nathaniel was three months old by that time. The permanency plan recites that Mother had "an extensive history" with DCS resulting in four of her other children being adopted. The plan listed dual goals of return to parent or adoption with a goal date six months later, on February 10, 2018. Mother disagreed with the dual goal of adoption. However, the plan stated that the dual goals were

deemed appropriate "[d]ue to history."[1]

The permanency plan listed three main concerns that prevented the children from returning to Mother's custody: alcohol and drug issues; mental health issues; and lack of housing, as Mother was homeless. The plan listed numerous responsibilities for Mother with respect to these issues. Regarding stability, the plan stated that Mother did not have stable housing "and is considered homeless," and she also lacked a legal source of income. It required Mother to obtain housing with utilities and furnishings, maintain housing for four months, and provide proof to DCS by way of a rental agreement or utility payments. It also required her to obtain a source of income and provide proof of such through pay stubs or other records. Mother was also required to develop a transportation plan with individuals who had a driver's license and insurance, and she was required to complete and maintain a budget with the assistance of her caseworker. She was required to maintain regular and positive supervised visitation with the children. The plan described as a strength that Mother "is affectionate towards her children."

Regarding substance abuse, the plan stated that Mother self-medicates and has "mental health issues with drugs." The plan stated that Mother had refused a drug screen on July 6, 2017, before the children were removed from her home, but that she had passed a drug test at a recent court appearance earlier that week. According to the plan, Mother had already completed an alcohol and drug assessment, and the recommendation from that assessment was for Mother to participate in an intensive outpatient program "weekly." The plan stated that Mother was "currently participating" and was to continue following the recommendation of the assessment. Mother was required to sign a release so that DCS could obtain the assessment and its recommendations and the treatment plan for the intensive outpatient program. The plan also required her to provide proof of any prescriptions and consent to random pill counts. Mother was required to submit to and pass random drug screens and to refrain from associating with known drug users. She was required to notify DCS if she lost TennCare coverage.

Additionally, Mother was required to address her grief and the loss of her children through "mental health services." She was required to communicate with a named individual "about a referral for a trauma assessment." The plan stated that Mother "is participating in mental health services," and it required Mother to sign a release so that DCS could get records from her mental health assessment and its recommendations. Regarding the criteria for terminating parental rights, the plan contained a handwritten note that "[Mother] was not comfortable with the explanation of this document and asked it not be discussed at the meeting." This initial permanency plan was ratified by the juvenile

---

[1] Aside from the statement in the permanency plan that Mother has "an extensive history" with DCS resulting in four of her other children being adopted, the record contains no other details about DCS's past involvement with Mother. Mother vaguely testified that the oldest child was adopted in 2009 "on a matter that was dismissed" and that she "was unable to comply with the requirements at that time[.]" Two other children are in the custody of their father.

court on September 20, 2017.

Before the six-month goal period ended, DCS developed a revised permanency plan on January 11, 2018. The revised plan extended the target date from February 10 to August 11, 2018. The revised plan stated that Mother was "very affectionate" during visits, holding the children and changing their diapers. The plan stated that she "is participating in mental health services." The plan stated that Mother had also completed a second alcohol and drug assessment on November 10, 2017. However, the plan stated that she had not followed through with the recommendation and that she still needed to complete the intensive outpatient program. Mother's responsibilities under the plan remained essentially the same. The revised permanency plan was ratified by the juvenile court on March 13, 2018.

One month later, on April 27, 2018, DCS filed a petition to terminate Mother's parental rights to Edward and Nathaniel.[2] The original permanency plan had been developed eight months earlier. The children had been in foster care for nine months. The petition sought to terminate Mother's parental rights on the grounds of abandonment for failure to establish a suitable home, substantial noncompliance with the permanency plans, persistent conditions, and failure to manifest a willingness and ability to assume legal and physical custody. The petition alleged that termination of Mother's parental rights was in the best interest of the children.

In July 2018, the trial court appointed counsel for Mother and a guardian ad litem for the children. A third permanency plan was developed while the case was pending. Trial was held on January 9, 2019. Three witnesses testified: a foster care team leader from DCS, Mother, and the individual with whom she was residing at the time of trial. At the beginning of the hearing, Mother addressed the court and requested a new attorney and a continuance for additional time to battle her addiction, but the trial court denied both requests. By the time of trial, sixteen months had passed since the initial permanency plan was developed, and the children had been in foster care for seventeen months.

Diana Rooker testified for DCS. She had served in a supervisory role as a "foster care team leader" for the majority of the children's time in foster care. In that role, Ms. Rooker supervised the case managers who worked the actual case. Ms. Rooker explained that she had not personally been "on the ground working directly with [Mother]," but that she had been in contact with Mother at times during the case. Mother had been assigned a series of four different caseworkers since the children entered custody. Ms. Rooker confirmed that the caseworkers' direct telephone numbers may have changed during these transitions but said that Mother could have contacted her by the "main number" at DCS. Ms. Rooker said that it was sometimes difficult to contact Mother because her telephone

---

[2] The petition also sought to terminate the parental rights of the children's putative father. He signed a waiver of interest, and his rights are not at issue in this appeal.

was disconnected. When asked to describe the efforts that DCS made to assist Mother, Ms. Rooker testified that, in January 2018 when the permanency plan was revised, Mother's caseworker at that time gave her a "binder" that included a Maury County resource guide with listings of job opportunities and several alcohol and drug treatment programs that she could attend.

Ms. Rooker described the requirements of the permanency plans developed for Mother. She confirmed that when the initial permanency plan was formed in August 2017, Mother was already participating in alcohol and drug treatment and mental health treatment. However, Ms. Rooker testified that Mother was subsequently discharged from the intensive outpatient program due to noncompliance with attendance, and the facility would not take Mother back as a client thereafter. Although the revised permanency plan stated that Mother had completed a second alcohol and drug assessment on November 10, 2017, which again recommended intensive outpatient treatment, Ms. Rooker did not mention this second assessment or the circumstances surrounding it during her testimony. According to Ms. Rooker, a caseworker named Courtney had scheduled yet another alcohol and drug assessment for Mother in March 2018 and arranged transportation for Mother, but she did not attend. Ms. Rooker said she personally offered to meet with Mother once, before one of her weekly visits with the children after the termination petition was filed, to schedule additional assessments. However, at the next scheduled visit, Mother "wasn't there."

Although Mother had completed a mental health assessment, Ms. Rooker testified that Mother did not sign a release for her mental health records until January 2018, and at that time, she was "not compliant" with her mental health services. Ms. Rooker testified that Mother "was attending" but "wasn't in compliance" and "lapsed," so she was required to take another mental health assessment to reestablish the services.

Ms. Rooker testified that Mother had been drug screened six times, but she did not specify when such testing occurred. She admitted she could not recall exactly which substances were positive on the screens. However, she said "the majority of them were methamphetamines, probably marijuana, and opiates." She said "the most consecutive one was the meth." After reviewing a record to refresh her memory, Ms. Rooker said that "[a]ll but one tested positive for methamphetamines." However, the records were not admitted at trial, and Ms. Rooker did not elaborate on when these tests occurred or their specific results. Ms. Rooker testified that Mother was last drug screened in November 2018, roughly two months before trial. The following exchange occurred regarding this screen:

Q. Okay. Do you know the results of that specific drug screen?
A. *No.* Not unless I submitted it to our attorney. It might be dated December -- from that -- results. *I believe* that was the one that she tested positive for amphetamine, meth, and marijuana. . . . I think the date was 11/29, and the results came in December.

(emphasis added). At another point in her testimony, Ms. Rooker stated unequivocally that this test was positive for meth, amphetamine, and marijuana.

Aside from the lack of clarity regarding the dates and specific drugs shown on the tests, it was also unclear how many screens were actually conclusive. When Ms. Rooker was asked if Mother ever refused a drug screen, she said no, but that oral swabs were used and Mother "did chew on or not give enough sample for them to be able to be submitted for testing." When asked how many times this happened, Ms. Rooker said she did not know. When asked to clarify if DCS administered six definitive drug screens and attempted to do more that were inconclusive, Ms. Rooker responded, "I personally – well, no." Thus, it is not clear from the testimony how many times Mother was screened and actually tested positive.

Moving to the issue of stability, Ms. Rooker testified that Mother "always" reported that she was doing odd jobs, like housekeeping or painting, but that she never provided proof of those. She said that Mother had provided DCS with seven different addresses during the seventeen months the children had been in custody. DCS had only conducted one home visit, at the first residence where Mother lived, where Mother was living with a gentleman and not on the lease. Mother had provided a handwritten rental agreement for one residence and two receipts. Ms. Rooker confirmed that Mother had also notified DCS about her most recent residence by October 2018, three months before trial, and that no one had attempted to investigate that residence.

Ms. Rooker said that the children are very attached and bonded to their foster parents, who desire to adopt the children. She described one visit with Mother where Nathaniel cried the entire time until the foster parents returned. Ms. Rooker confirmed that Mother does consistently attend visitation with the children "every Thursday," when visitation is scheduled from 4:30 to 6:30. She also said that Mother brings food and/or diapers to the visits. However, she said that Mother often arrives late or leaves early. She did not know the number or percentage of times that Mother was late or left early but said that it was "the majority of the time." Ms. Rooker acknowledged that she did not have "specific direct knowledge" of these details but said that in her role as supervisor she would "enter those [details] into our system" and sometimes get phone calls from caseworkers during the visits.

Mother testified as well. She was expecting her ninth child at the time of trial. Mother testified that her situation had finally improved in recent months because she had found a place to live and also obtained a sponsor for support. She was critical of "the lack of help from the Department of Children's Services" and said they basically "just hand[ed] me a pamphlet saying here's all of these resources" when "I didn't have anything." Mother recalled having at least three to four different caseworkers and said there were times when she did not know who her caseworker was. Mother said that she had asked the individuals

- 6 -

who supervised her visits for additional assistance to no avail. She felt that it was unfair for DCS to seek termination of her parental rights without working on "both parts of the case."

Mother testified that she had attended visits regularly on Thursdays throughout the seventeen-month period that the children had been in custody. She estimated that seventy to eighty visits were scheduled during that time period but said that she had cancelled three visits and that the supervisor had cancelled some visits when the children were sick or injured, there were issues with the paperwork, or the supervisor was unavailable. The visits were scheduled for two hours, but Mother admittedly left early most of the time. Mother said this was partly because she had depended on others for transportation. Mother also acknowledged that in the beginning, Nathaniel would cry almost the entire time, and she thought it was uncomfortable for such young children to visit in a tiny closed room for two hours. Mother testified that Nathaniel had not been throwing fits for the past two to four months and that he was now "100% interactive" with her. She claimed that the children were very happy with her and very attached to her.

Mother testified that she completed her mental health assessment on her own, through a hospital, but that she was unable to complete the recommended therapy at that facility because she lost her residence. She also testified that she completed the initial alcohol and drug assessment but was only able to complete three of the required classes in the intensive outpatient program because she lost her residence. Mother explained that she did not have a residence for some periods of time and that she had no vehicle and no family or friends for support. Mother testified that she tried to go to a few homeless shelters but that she was turned away because she did not have identification. She testified that when the caseworker named Courtney gave her the binder, in early 2018, she attempted to do her assessments again and also sought mental health counseling again at the same place where she began her mental health services initially. Mother testified that she went to a rehabilitation facility, but they told her she would have to go through a detox program before she would be accepted. She said she went to a detox program in Nashville but was turned away because of the type of drugs she had used. Mother testified that Courtney had assisted her with beginning this detox program but that she did not provide any further assistance because she left DCS. Mother testified that the facility where she was originally assessed for alcohol and drug treatment turned her away because she had no insurance.

Mother testified that she was not able to continue with her resumed mental health treatment because she lost her residence again. She said she attempted to "get into" a facility called Place of Hope but she did not have insurance and was denied. However, Mother met two counselors from the facility who assisted her on their own. Mother testified, "I took it on myself to do my own IOP [intensive outpatient program.]" Mother said she obtained a twelve-step program through the counselors, and one of them became her "sponsor." Mother testified that she was attending Narcotics Anonymous and Alcoholics Anonymous meetings four to six times per week. She said, "I'm trying to make

do with what I can do." Mother conceded that she was addicted to methamphetamine, amphetamine, and marijuana. She said she had been struggling with the same addiction since her child died five to six years earlier. When asked to clarify if she was currently enrolled in an intensive outpatient program, Mother responded affirmatively, adding "through my sponsor."

Mother had moved into an apartment with one of the counselors around July or August 2018, and she was pregnant with his child at the time of trial. Mother had been residing with him for five to six months in a two-bedroom apartment, and the other counselor, her female sponsor, lived in an apartment next door. Mother testified that she notified DCS about her residence in September 2018, when her roommate accompanied her to a child and family team meeting, but that no one came to visit the residence despite her repeated requests. Mother testified that the landlord was supposed to bring her the paperwork to add her name to the lease but that she was still waiting for him to do so. DCS had only visited one of Mother's prior residences, but Mother acknowledged that she had not really had a stable place to live until this location. Mother was not employed at the time of trial but said that she had been working "odds and ends jobs." She testified that her last job had ended the week before trial, and she had been working full-time hours for two to three weeks in that job. She testified that she paid rent from time to time when she could. Mother said she had a resume and had been submitting applications with a number of employers, and she had received some replies but was "kind of waiting" until the trial date passed to start a work schedule.

Mother claimed that she had been following her twelve-step program for the past six months. She felt that she was "in a better place" at the time of trial and said that she could now pass drug tests. Mother said that she was now able to understand her addiction problem and the source of her addiction and what she needed to do to address it appropriately. However, she testified that she needed more time to get herself together for her children "because it is a 12-month process before and then it is a 12-month process after that – to be able to show and maintain that I'm able and have the capability to take care of these children." Mother admitted to struggling with grief, trauma, and various other issues but said that she needed "a lot of help" and had not received the assistance she needed.

The individual with whom Mother was residing testified that he was formerly employed at Place of Hope but not presently employed there. His employment at Place of Hope ended in June 2018 (before Mother moved into his apartment). He explained that he had helped to counsel drug and alcohol patients at the facility. He did not have any type of degree in counseling, but he had taken "counseling classes" and attended a required number of AA/NA meetings. The individual testified that he was helping to sponsor Mother and supporting her in working through her twelve-step program. He testified that he was driving Mother to AA/NA meetings at least three days per week and that she had been attending those for a few months. He claimed that he had not seen Mother under the

influence of any intoxicant since she had been living with him. He said she was babysitting and housekeeping to earn money.

At the conclusion of the testimony, the trial judge announced his oral ruling. Notably, he stated that when considering the grounds for termination, there was "a cutoff time period on this that the Court has to look at." Relative to grounds for termination, the trial judge announced that he could only consider events that happened *on or before* the date the termination petition was filed. The trial judge stated that he could only consider events that transpired *after* the termination petition was filed to the extent that it affected the children's best interest. The trial judge then announced his ruling that grounds for termination had been established by clear and convincing evidence and that termination of parental rights was in the best interest of the children. Mother timely filed a notice of appeal.

## II. ISSUES PRESENTED

The only issue raised in Mother's brief on appeal is whether termination of her parental rights is in the best interest of the children. Although Mother's brief does not challenge the trial court's rulings on the grounds for termination, we must review the trial court's findings as to the grounds as well. *See In re Carrington H.*, 483 S.W.3d 507, 511 (Tenn. 2016) (holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal");[3] *see, e.g.*, *In re Heaven J.*, No. W2016-00782-COA-R3-PT, 2016 WL 7421381, at *3 (Tenn. Ct. App. Dec. 22, 2016) (reviewing and reversing all grounds for termination even though the father did not challenge the trial court's findings regarding the various grounds).

## III. STANDARDS APPLICABLE TO TERMINATION CASES

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Pursuant to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground." Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering

---

[3] In another case in which an attorney offered "little argument" regarding grounds for termination, relying instead on this Court's duty as stated in *Carrington*, we "caution[ed] counsel against the use of our Supreme Court's holding in this manner." *In re Yariel S.*, No. E2016-00937-COA-R3-PT, 2017 WL 65469, at *6 (Tenn. Ct. App. Jan. 6, 2017) (citing Tenn. Sup. Ct. R. 8, RPC 8(3) (providing that lawyers are obligated to act as a zealous advocate on behalf of his or her client)). We do the same here.

the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Kaliyah S.*, 455 S.W.3d at 552.

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established and eliminate "any serious or substantial doubt about the correctness" of the findings. *Id.*

Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Grounds for Termination

### 1. Abandonment by Failure to Establish a Suitable Home

Tennessee Code Annotated section 36-1-113(g)(1) provides that one ground for termination of parental rights exists if "abandonment" has occurred within the meaning of section 36-1-102. In this case, DCS alleged that abandonment had occurred pursuant to the following definition:

> (ii) The child has been removed from the home of the parent . . . as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months

following the removal, the department or agency has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] made no reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2018). Thus, "if the petitioner in a termination proceeding seeks to rely on the ground of abandonment by failure to provide a suitable home, DCS's reasonable efforts are mentioned specifically in the definition of that ground for termination," and "proof of reasonable efforts is required." *In re Kaliyah S.*, 455 S.W.3d at 554 n.31, 555 n.32. A showing of reasonable efforts is one of the "elements" that must be proven under this ground. *In re Lesley A.*, No. E2018-00594-COA-R3-PT, 2018 WL 6655680, at *14 (Tenn. Ct. App. Dec. 18, 2018). To meet this definition of abandonment, DCS has the burden to prove by clear and convincing evidence that its efforts were reasonable under the circumstances. *In re T.R.*, No. E2017-02115-COA-R3-PT, 2018 WL 4441359, at *7 (Tenn. Ct. App. Sept. 17, 2018); *In re Michael B., Jr.*, No. E2017-00486-COA-R3-PT, 2017 WL 3447908, at *7 (Tenn. Ct. App. Aug. 11, 2017); *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *8 (Tenn. Ct. App. June 10, 2014); *In re Isobel V.O.*, No. M2012-00150-COA-R3-PT, 2012 WL 5471423, at *8 (Tenn. Ct. App. Nov. 8, 2012).[4]

---

[4] As this Court explained in *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *8 (Tenn. Ct. App. Mar. 9, 2004), *overruled by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015),

This heightened burden of proof does not alter the standard by which the Department's efforts will be judged--the "reasonableness" standard. Rather, it simply requires the Department to present sufficient evidence regarding its [] efforts to enable the trier-of-fact to conclude, without any serious or substantial doubt, that the Department's [] efforts were reasonable under all the circumstances.

We note that "[i]n *In re Kaliyah S.*, the supreme court held that, as a general rule, DCS is not required to prove that it exerted reasonable efforts as a precondition to terminating a parent's parental rights." *In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at *8 (Tenn. Ct. App. June 6, 2017). Instead, the extent of DCS's efforts is, generally, one factor to be considered in the best interest analysis. *Id.* In that context, "[a]s with other factual findings made in connection with the best-interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555.

However, "[o]ur supreme court noted a single exception to this general rule: because the ground for termination of abandonment by failure to provide a suitable home expressly references DCS's reasonable efforts, such efforts must be shown to rely on this ground." *In re E.C.*, 2017 WL 2438574, at *8. "The ground of failure to provide a suitable home is an exception because that ground specifically incorporates reasonable efforts." *In re Da'Vante M.*, No. M2017-00989-COA-R3-PT, 2017 WL 6346056,

As the Tennessee Supreme Court has recognized,

> In many circumstances, the success of a parent's remedial efforts is intertwined with the efforts of the Department's staff to provide assistance and support. Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not.

*In re Kaliyah S.*, 455 S.W.3d at 556 (quoting *In re C.M.M.*, 2004 WL 438326, at *7). However, "'[p]arents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from custody.'" *In re Kambri P.*, No. M2019-01352-COA-R3-PT, 2020 WL 2991793, at *5 (Tenn. Ct. App. June 4, 2020) (quoting *In re Shameel S.*, No. E2014-00294-COA-R3-PT, 2014 WL 4667571, at *5 (Tenn. Ct. App. 2014)). As the statute notes, DCS's efforts "may be found to be reasonable if such efforts *exceed* the efforts of the parent." Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2018) (emphasis added).[5] DCS may offer proof of reasonable efforts during any four-month period following a child's removal. *In re Roderick R.*, No. E2017-01504-COA-R3-PT, 2018 WL 1748000, at *11 n.13 (Tenn. Ct. App. Apr. 11, 2018) *perm. app. denied* (Tenn. July 12, 2018).

In this case, the initial permanency plan, developed in August 2017, stated that Mother was currently homeless. The plan required Mother to obtain housing with utilities and furnishings, maintain housing for four months, and submit proof to DCS by way of a rental agreement or utility payments. At trial in January 2019, Ms. Rooker counted seven different addresses that Mother had provided to DCS during the seventeen months between the children's removal and the time of trial. However, the record reveals surprisingly little about those seven residences. DCS had only visited one residence -- Mother's first residence, in September 2017 -- sixteen months before trial. The only thing Ms. Rooker

---

at *16 (Tenn. Ct. App. Dec. 12, 2017). *See, e.g.*, *In re Lesley A.*, 2018 WL 6655680, at *15 (finding clear and convincing evidence to support the element of reasonable efforts by DCS); *In re Seth B.*, No. E2017-00173-COA-R3-PT, 2017 WL 4082484, at *8 (Tenn. Ct. App. Sept. 14, 2017) (same); *In re Quintin S.*, No. E2016-02150-COA-R3-PT, 2017 WL 2984193, at *10 (Tenn. Ct. App. July 13, 2017) (same).

[5] Effective July 1, 2018, this statute was amended to provide that DCS's efforts to assist a parent in establishing a suitable home will be found reasonable "if such efforts *equal or exceed* the efforts of the parent" toward the same goal. 2018 Tenn. Laws Pub. Ch. 875 (emphasis added). However, the termination petition was filed in this case in April 2018, so the amendment does not apply. *See In re H.A.*, No. E2018-01914-COA-R3-PT, 2019 WL 549650, at *5 n.7 (Tenn. Ct. App. Feb. 12, 2019) ("Because this amendment did not become effective until July 1, 2018, following the filing of the termination petition at issue, there is no dispute that the above language is inapplicable in this case.")

said about that location was that Mother "was living with a gentleman" who was "going to help support her" and was not listed on the lease. Ms. Rooker said that Mother had provided "handwritten proof of a rental agreement" for one residence and "two receipts," but nothing that Ms. Rooker considered "a legal binding document." Ms. Rooker was under the impression that Mother "just kind of stayed wherever somebody will let her stay." Ms. Rooker confirmed that Mother had notified DCS about her most recent residence by October 2018, three months before trial, and that no one had attempted to investigate that residence either. Thus, Ms. Rooker admittedly had no knowledge of whether it would be suitable for children.

Notably, there was no testimony regarding *any* effort by DCS to assist Mother specifically with housing.[6] Although we do not know specific details about Mother's seven residences, Mother conceded at trial that she did not really have a stable residence before her current apartment. She had been homeless for some periods of time and was turned away from homeless shelters for lack of identification. Mother testified that she discussed her living situation with DCS in September 2018, when her roommate accompanied her to a child and family team meeting, but that no one came to visit the residence despite her request for a home visit. Mother said she subsequently asked another individual from DCS, named Alexis, to come check her residence two or three times, but no one came. In summary, we conclude that DCS made no effort to assist Mother with housing, while Mother made efforts to secure housing on her own and provided information about her housing situation to DCS on numerous occasions.

We recognize that "the concept of a home's suitability is not a narrow one limited solely to consideration of the physical structure of the parent's residence." *In re Madux F.*, No. E2019-01535-COA-R3-PT, 2020 WL 1893646, at *11 (Tenn. Ct. App. Apr. 16, 2020). Having a suitable home requires more than a physical living space. *Id.* Accordingly, "the parent's efforts to comply with the responsibilities in the permanency plan are directly relevant to the ability to provide a suitable home." *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *4 (Tenn. Ct. App. Feb. 8, 2019) (citing *In re Kayla B.*, No. E2016-01192-COA-R3-PT, 2017 WL 438622, at *6 (Tenn. Ct. App. Feb. 1, 2017)). In the same manner, "providing drug screens, maintaining consistent communication with a parent, coordinating alcohol and drug assessments, and offering counseling services" may also evidence reasonable efforts to assist a parent in establishing a suitable home. *In re H.S.*, No. M2019-00808-COA-R3-PT, 2020 WL 1428777, at *7

---

[6] The trial court's final order states, "FSW Rooker testified that the Department . . . offered or provided [Mother] with Maury County Public Transportation contacts, . . . [and] offered or provided [Mother] with a list of low-income housing providers in Maury County." However, our review of the record reveals no such testimony from Ms. Rooker. This was alleged in the termination petition but never mentioned during Ms. Rooker's testimony. Even if a list had been provided, "DCS must do more than simply provide parents with a list of housing resources to prove that it made reasonable efforts to assist with housing." *In re Skylar P.*, No. E2016-02023-COA-R3-PT, 2017 WL 2684608, at *4 (Tenn. Ct. App. June 21, 2017).

(Tenn. Ct. App. Mar. 20, 2020). Ultimately, however, we must "analyze the reasonableness of DCS's efforts to assist a parent on a 'case-by-case basis in light of the unique facts of the case.'" *In re Kaden W.*, No. E2018-00983-COA-R3-PT, 2019 WL 2093317, at *7 (Tenn. Ct. App. May 13, 2019) (quoting *In re Bernard T.*, 319 S.W.3d at 601).

Our ability to review the sufficiency of DCS's efforts in this case is hampered by the lack of detail in Ms. Rooker's testimony as to several key issues.[7] Ms. Rooker testified that Mother had been drug screened six times, but Ms. Rooker only provided the date of one screen, shortly before trial. Thus, we cannot discern when DCS made any efforts in this regard. Also, it appears that at least some of those six tests were inconclusive, so we do not know how many times Mother actually tested positive for substances. Ms. Rooker did testify that Mother never refused a drug screen. The initial permanency plan stated that Mother had passed a drug screen at a court appearance earlier that week. Ms. Rooker testified that Mother did not provide any proof of prescriptions so there was no need to do random pill counts. She conceded that this requirement of the permanency plan might not apply to Mother. DCS did not present any evidence that Mother was associating with known drug users in violation of the permanency plan.

Ms. Rooker's testimony about Mother's mental health was, again, not very helpful. The permanency plan required Mother to address her grief and the loss of her children through "mental health services." Mother testified that she obtained a mental health assessment "on [her] own" through a hospital but that she was unable to complete the recommended therapy at that facility because she lost her residence. She resumed treatment for a time but stopped again when her residence changed. Ms. Rooker testified that Mother did complete her mental health assessment but that she did not follow its recommendations. Ms. Rooker initially testified that Mother followed no recommendations of the mental health assessment "whatsoever." However, when asked what those recommendations were, she did not know. Ms. Rooker mentioned "sporadic appointments" and that Mother was required to do another mental health assessment in February 2018. When asked if Mother completed that second assessment, again, Ms. Rooker did not know. Ms. Rooker said that the permanency plan also mentioned a trauma assessment, but she did not know if the trauma assessment was included in the mental health assessment. Ms. Rooker emphasized that Mother did not sign the release so that DCS could obtain the treatment plan from the mental health assessment for the first five months, but there was no evidence to suggest that Mother was ever presented with a release and refused to sign it or otherwise offered assistance with the forms. Moreover, Mother did sign the release giving DCS access to the records one year prior to trial. According to Ms. Rooker, once DCS obtained Mother's mental health records, it determined that she was "not compliant" with her mental health services. However, all three permanency

---

[7] We note that Ms. Rooker's testimony was very brief. The transcript of her testimony is less than fifty pages.

- 14 -

plans, from August 2017, January 2018, and June 2018, stated that Mother "is participating in mental health services."

When the initial permanency plan was developed in August 2017, Mother had already completed her alcohol and drug assessment.[8]  That assessment recommended intensive outpatient treatment "weekly," and Mother was participating in that treatment when the plan was developed.  Mother testified that she had to stop attending the treatment after three sessions because she lost her residence and had no vehicle or assistance from family or friends.   Ms. Rooker confirmed that Mother was discharged due to noncompliance with attendance, and that the facility "wouldn't take her back as a client." As noted above, there was no testimony regarding any effort to assist Mother with transportation aside from one offer related to an appointment scheduled in March 2018.

The revised permanency plan states that Mother completed a second alcohol and drug assessment on November 10, 2017.  However, we do not know the circumstances surrounding this assessment.  The revised plan stated that Mother had not followed through with the recommendation and still needed to complete an intensive outpatient program. According to Ms. Rooker, a caseworker named Courtney scheduled a third alcohol and drug assessment for Mother in March 2018 (just four months after she completed her second) and arranged transportation for Mother, but she "did not attend."   However, Mother testified that she did attempt to do her assessments again after Courtney gave her the binder.  Mother testified that she went to a rehabilitation facility but was told that she would have to go through a detox program before she could be accepted.  She said she went to a detox program in Nashville called Buffalo Valley but was turned away because of the type of drugs she had used.  Mother acknowledged that Courtney had assisted her with "accessing" the detox program but said she left DCS shortly thereafter and did not provide her with any further assistance regarding other programs.  Mother testified that she did not have insurance and was turned away from the facility where she was originally assessed and Place of Hope.  Ms. Rooker said she offered to meet with Mother once, after the termination petition was filed, to schedule additional assessments before a visit, but Mother "wasn't there."  At the time of trial, Mother testified that she had been working on her own twelve-step program for six months with the assistance of her sponsor and attending AA/NA meetings four to six times per week, "trying to make do with what I can do."

DCS had provided visitation for Mother and the children, which Mother consistently attended almost "every Thursday" for seventeen months.  The revised permanency plan

_____

[8] The June 21, 2017 petition to transfer custody to Mother's sister states that Mother had already been referred for an alcohol and drug assessment and mental health assessment by CPS.  Mother testified that she began her treatment "as soon as [the children] went into my sister's custody."  Thus, any efforts to refer Mother for the initial assessment were prior to removal of the children from Mother's home.  This ground for termination requires reasonable efforts "for a period of four (4) months following the removal." Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2018).

- 15 -

stated that Mother was "very affectionate" with the children during visits, holding them and changing their diapers. She also brought diapers and food to the visits, although Ms. Rooker opined that the food was not appropriate because it consisted of items such as Lunchables, Cheetos, and soda. The efforts of DCS and Mother appear to be equal with respect to visitation.

Ms. Rooker testified that Mother "always" stated that she was doing odd jobs, like housekeeping, but that she never provided proof of those. Ms. Rooker testified that in January 2018, when the August 2017 permanency plan was revised, Mother's caseworker Courtney provided her with a binder that included a Maury County resource guide with job opportunities. This was the only evidence of DCS's effort to assist Mother in finding employment. We also note that DCS filed its termination petition just three months later. Mother testified at trial that she had been working odd jobs up until the week before trial, and she had recently applied at several employers but had not committed to anything because of the upcoming trial date and her schedule. There was no proof of any effort to assist her with developing a budget, although the permanency plan stated, "FSW will help [Mother] develop a budget."

As previously noted, Mother was critical of DCS for assigning her a series of four different caseworkers and "just handing me a pamphlet saying here's all of these resources" when she "didn't have anything." She sometimes did not know who her caseworker was. She testified that she had asked the individuals who supervised her visits for more assistance to no avail.

Again, in order to prove this definition of abandonment, DCS had the burden to show by clear and convincing evidence that its efforts to assist Mother in establishing a suitable home were reasonable under the circumstances. *In re T.R.*, 2018 WL 4441359, at *7; *In re Michael B., Jr.*, 2017 WL 3447908, at *7. *See, e.g.*, *In re Julian J.*, No. M2018-00882-COA-R3-PT, 2019 WL 956224, at *6 (Tenn. Ct. App. Feb. 26, 2019) (reversing this ground for termination where the case worker who testified at trial "was unaware of any efforts by DCS to assist Mother with housing" during the relevant period); *In re Seth Mc.*, No. M2017-02562-COA-R3-PT, 2018 WL 3060366, at *6 (Tenn. Ct. App. June 20, 2018) (concluding that "DCS failed to show that it made reasonable efforts during the relevant four-month periods to assist Mother in obtaining suitable housing, as it must"); *In re Isabella G.*, No. M2016-02105-COA-R3-PT, 2017 WL 4407816, at *6 (Tenn. Ct. App. Oct. 3, 2017) (finding that DCS failed to show reasonable efforts where it only administered a few drug screens and the testimony regarding housing assistance was "vague at best"); *In re Rylan G.*, No. E2016-02523-COA-R3-PT, 2017 WL 2805194, at *5 (Tenn. Ct. App. June 28, 2017) (finding no reasonable efforts to assist in obtaining suitable housing where the caseworker only did a walkthrough of a residence and pointed out deficiencies); *In re Skylar P.*, 2017 WL 2684608, at *4-5 (reversing where DCS made no effort beyond providing a list of housing resources and failed to provide "any services to facilitate Mother's mental health treatment"); *In re Yariel S.*, 2017 WL 65469, at *6

(reversing where there was no evidence of any efforts related to housing); *In re Isobel V.O.*, No. M2012-00150-COA-R3-PT, 2012 WL 5471423, at *9 (Tenn. Ct. App. Nov. 8, 2012) (reversing where DCS did nothing more than provide "a list of possible housing options").

As in the cases cited above, we conclude that DCS failed to prove that it made reasonable efforts to assist Mother in establishing a suitable home. Clearly, Mother faced an uphill battle. She was homeless, addicted to meth, and suffering from mental health issues. She testified that she "lost everything" for a period of time, including her phone. As Mother noted at trial, she needed "a lot of help."[9] Inexplicably, DCS made no effort to assist her with her most basic need of housing. It offered transportation assistance for only one appointment, in March 2018. Its effort to help Mother find employment was limited to giving her a binder that contained some job listings, five months after the original permanency plan was developed and just three months before the termination petition was filed. Mother obtained a mental health assessment "on [her] own" through a hospital, and she completed two alcohol and drug assessments. Aside from providing the binder, it does not appear that DCS offered any real assistance after these assessments were completed to help Mother comply with the *recommendations* of attending mental health counseling and an intensive outpatient treatment program. Mother said she received assistance in "accessing" one detox program, which did not ultimately accept her, and she was turned away from numerous other facilities.

During closing argument in this case, counsel for DCS stated that "the Department has been standing with their arms open the whole time." Respectfully, the circumstances of Mother's case required DCS to do more. As noted above, the employees of DCS "must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not."[10] *In re Kaliyah S.*, 455 S.W.3d at 556. When reasonable efforts are required, "the Department must do more than merely provide a list of services to the parent, point them in the right

---

[9] This Court has recognized "the pervasive and powerful effects of methamphetamine addiction." *In re C.A.H.*, No. M2008-00005-COA-R3-PT, 2008 WL 3068430, at *8 (Tenn. Ct. App. Aug. 1, 2008); *see, e.g.*, *In re Z.V.S.P.*, No. M2009-00058-COA-R3-PT, 2009 WL 1910919, at *7 n.8 (Tenn. Ct. App. July 1, 2009) (noting "the extreme destructive power of methamphetamines and the drug's high rate of recidivism as compared to other abused substances"); *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *11 (Tenn. Ct. App. Apr. 14, 2005) ("The Department and its professional staff must know and understand that persons with addictions to substances as powerful as methamphetamine have false starts and set backs, as well as successes and, regrettably, backsliding.")

[10] During closing argument, counsel for DCS also stated the following with respect to assistance with housing and employment:

> We're not a real estate agency, Judge, and we're not an employment agency, but what we do do in regards to both of those things, is we will help with resumes. We'll give you information to find people that hire here locally. We will provide you with Section 8 information and help you fill out your application. All you have to do is ask. She didn't ask.

- 17 -

direction, and rely on parents to facilitate their own rehabilitation." *In re M.B.*, No. M2006-02063-COA-R3-PT, 2007 WL 1034676, at *5 (Tenn. Ct. App. Mar. 30, 2007). DCS has not shown that its efforts toward the goal of establishing a suitable home exceeded those of Mother in this case. We reverse the trial court's finding that this ground for termination was proven by clear and convincing evidence.[11]

## 2. Substantial Noncompliance

The next ground for termination alleged by DCS and found by the trial court was substantial noncompliance. Permanency plans are "'meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care.'" *In re Kambri P.*, 2020 WL 2991793, at *8 (quoting *In re C.S., Jr.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006)). "'This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.'" *Id.* (quoting *In re C.S., Jr.*, 2006 WL 2644371, at *10). Thus, the parental termination statute provides that one ground for termination exists if "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2).

In analyzing this ground for termination, we must first find that the permanency plan requirements were reasonable and related to remedying the conditions that necessitated foster care placement. *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002). We have already set out the requirements in Mother's permanency plans, and we conclude that those were reasonable and related to remedying the concerns regarding her drug use, mental health issues, and lack of stability.

Next, we must consider whether Mother's noncompliance with the plans was substantial. "[N]oncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial." *In re Valentine*, 79 S.W.3d at 548. Not every failure

---

[11] In its brief on appeal, when addressing reasonable efforts, DCS states that it "arranged and paid for parenting classes for Mother." However, parenting classes were not mentioned in the permanency plans or by Mother during her testimony at trial. When citing to the record, DCS references a "permanency hearing order" that was made an exhibit at trial and stated that DCS was "providing or referring" certain services to Mother *and* the children's father. A checkmark was placed in a box beside "Parenting classes." Ms. Rooker read this section of the permanency hearing order at trial but did not otherwise mention parenting classes.

DCS also cites to Ms. Rooker's testimony that *if there had been any problems with payment for services*, DCS "would have paid for any services that she needed." However, Ms. Rooker added, "[s]he had insurance." The only thing Ms. Rooker mentioned DCS actually paying for was "parenting through the therapeutic visitation." Thus, it is not at all clear from the record that DCS paid for parenting classes for Mother. However, if it did, Mother apparently attended the classes, indicating that she made equal effort to DCS with respect to this issue. Either way, this isolated reference to parenting classes does not impact our conclusion.

to comply with a permanency plan will constitute grounds for termination of parental rights. *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *14 (Tenn. Ct. App. Sept. 14, 2012). "Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537. "In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548.[12]

When analyzing this ground, "[o]ur concern is with the parent's *efforts* to comply with the plan, not the achievement of the plan's desired outcomes." *In re Daniel B., Jr.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *5 (Tenn. Ct. App. July 10, 2020) (citing *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009)) (emphasis added). In other words, "'outcome achievement is not the measure of compliance.'" *In re Mya V.*, No. M2016-02401-COA-R3-PT, 2017 WL 3209181, at *6 (Tenn. Ct. App. July 28, 2017) (quoting *In re B.D.*, 2009 WL 528922, at *11). At the same time, however, merely "'going through the motions' does not constitute substantial compliance." *In re Carrington H.*, 483 S.W.3d at 537.

Once again, we must examine Mother's efforts to comply with the requirements of the permanency plans. At trial, Ms. Rooker acknowledged that Mother visited with the children, for the most part, "every Thursday" during the seventeen months that they were in foster care. She brought diapers and food to visits and was "very affectionate" with the children. Thus, she substantially complied with the plan's requirement regarding visitation.

As noted in the permanency plan, the three major concerns for Mother were her drug use, her mental health, and her lack of housing/stability. We will first consider the requirements regarding drug use. The August 2017 permanency plan required Mother to continue following the recommendation of her alcohol and drug assessment to attend outpatient treatment "weekly." There was no testimony as to how many weekly sessions the program required. Mother attended at least three sessions but stopped attending when she lost her residence. She completed a second alcohol and drug assessment in November 2017. However, she never completed an intensive outpatient program at a facility. At some point, Mother was told that she could not return to the original facility where she was attending treatment because she had no insurance. Ms. Rooker confirmed that the original facility would not take Mother back as a client. Mother attempted to enter a rehabilitation facility but was told that she had to complete detox first. She went to a detox facility in

---

[12] For the ground of substantial noncompliance, DCS is not required to prove that it made reasonable efforts to assist the parent as an essential component of the ground for termination. *In re Quintin S.*, No. E2016-02150-COA-R3-PT, 2017 WL 2984193, at *15 (Tenn. Ct. App. July 13, 2017).

Nashville but was told that she did not qualify because of the type of drugs she had taken. She also sought assistance at Place of Hope. She was turned away from all of these facilities. (The permanency plan required Mother to notify DCS if she lost her TennCare coverage, and there is no indication that she did so. However, she did sign the release so that DCS could access her records.) After all of these rejections, Mother was attempting to follow her "own IOP" by attending AA/NA meetings three to six times per week and following a twelve-step program for the past six months with the assistance of a sponsor. Thus, Mother did make efforts to submit to alcohol and drug assessments, follow their recommendations, and otherwise address her drug addiction.

The plan also required Mother to submit to and pass drug screens. Again, Ms. Rooker testified that Mother was screened six times, some screens were inconclusive, and she never refused a drug screen.[13] Of the screens that showed results, all but one was positive for meth. However, we do not know how many times Mother actually tested positive or, for the most part, when the tests were administered. We do know that Mother passed a drug test a few days before the initial permanency plan was developed, and she was screened two months before trial and tested positive for multiple substances. Regarding the pill count requirement, Ms. Rooker acknowledged that it might not apply because Mother had not submitted proof of any prescriptions. There was no evidence that Mother was associating with known drug users in violation of that requirement of the plan.

Regarding mental health, the plan vaguely required Mother to address her grief and the loss of her children through "mental health services." It mentioned a referral for a trauma assessment, but even Ms. Rooker was unsure of whether this would be included as part of Mother's mental health assessment. Mother completed a mental health assessment on her own through a hospital and said she was told that she needed "more counseling." She admittedly did not complete the counseling after she lost her residence. Mother resumed counseling for an unspecified time but again stopped when her residence changed. Ms. Rooker testified that Mother was "not compliant" but also admitted that she did not even know what the mental health intake had recommended for Mother. She mentioned "sporadic appointments" and said a second mental health assessment was required in February 2018, but she did not know if Mother completed that either. All three permanency plans stated that Mother was "participating" in mental health services. At the time of trial, Mother testified that she was being counseled by her sponsor, who was a former counselor

---

[13] The trial court found that Mother failed drug screens on November 2, 2017, and January 11, 2018, and listed various substances that were positive for each test. The trial court further found that "FSW Rooker testified that the Department . . . offered to perform additional drug screens, which [Mother] refused." From our review of the record, we find no testimony to support any of these findings. Ms. Rooker testified, "*She never refused*, but the oral swabs you have to put in your mouth, she did chew on or not give enough sample for them to be able to be submitted for testing." (emphasis added). Ms. Rooker never testified about a November 2017 drug screen or a January 2018 drug screen. The petition for termination of parental rights *alleged* that Mother had failed these two drug screens for these substances, but no evidence was presented at trial to that effect.

at Place of Hope but not licensed. She had set up a couple of appointments at another facility called Centerstone recently but had not yet started attending there. Mother said she was trying to focus on her alcohol and drug issues, weekly visitation, and working, and she was admittedly "overwhelmed" by it all.

Finally, regarding stability, the plan required Mother, who was homeless, to obtain stable housing with utilities and furnishings, maintain such housing for four months, and provide proof of such to DCS. At the time of trial, Mother was residing in a two-bedroom apartment and had been living there for around five to six months. She was not listed on the lease yet but testified that she was in the process of being added. As the trial judge aptly noted, Mother was in a place "substantially better than where she was before," which was "a huge step in the right direction." Mother had provided information about this residence to DCS, and she had also informed DCS about six previous residences and provided a handwritten rental agreement and two receipts. The permanency plan required Mother to develop a transportation plan, and her roommate testified that he was her source of transportation. The plan required Mother to establish a legal source of income and provide proof such as pay stubs. According to Ms. Rooker, Mother "always stated that she was doing odd jobs" but never provided proof of those. The plan required Mother to develop a budget with the assistance of her caseworker, but there was no testimony that anyone attempted to help Mother accomplish this task as required by the plan.

DCS filed its petition to terminate Mother's parental rights only eight months after developing the initial permanency plan. Overall, the record shows that Mother had not achieved the desired outcomes of the permanency plan in the sixteen-month period that passed prior to trial. However, it also reflects that she made considerable *efforts*, under difficult circumstances, toward addressing her instability, mental health issues, and drug use, while consistently maintaining weekly visitation with the children. As the trial judge stated at the conclusion of the testimony, Mother is "not done" but she's "taking steps in the right direction." He commended her for "where she is right now and where she's gotten herself."[14]

"Clear and convincing evidence" must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013). The evidence presented by DCS regarding

---

[14] As noted above, the trial judge stated that he could not consider any events that had occurred since the filing of the termination petition relative to grounds for termination. The trial court erred in this regard. "Improvement toward compliance should be considered in a parent's favor." *In re Valentine*, 79 S.W.3d at 549 (considering that the parent's "poor record of visitation prior to the filing of the termination petition [stood] in marked contrast to her commendable efforts in the year prior to the hearing"); *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *6 (Tenn. Ct. App. Mar. 22, 2019) (recognizing the parent's "post-petition efforts"); *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016) ("While Father was slow in complying, by the time of the hearing, he had accomplished or begun work on the majority of the requirements.")

this ground for termination does not rise to that level.  Parents with addiction and mental health issues "'can turn their lives around,' but must be given the time and opportunity to do so." *In re Abigail F.K.*, 2012 WL 4038526, at *18 (quoting *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *12 (Tenn. Ct. App. June 16, 2011)).  Focusing on Mother's efforts, under very difficult circumstances, the record does not clearly and convincingly establish that Mother's noncompliance with the permanency plans was substantial.  *See, e.g.*, *In re Valentine*, 79 S.W.3d at 549 (reversing this ground where the parent had stable housing, attended parenting classes, partially complied with the visitation requirement, but did not comply with requirements of attending individual counseling and undergoing a neuropsychiatric evaluation); *In re Analilia R.*, No. E2015-00479-COA-R3-PT, 2015 WL 7567090, at *10 (Tenn. Ct. App. Nov. 24, 2015)  (reversing the ground of substantial noncompliance where the father faced significant hardships but "did make substantial steps" and "at least sincerely attempted to meet his responsibilities" even though he never completed an alcohol and drug assessment, domestic violence counseling, anger management counseling, or family counseling as required); *In re Abigail F.K.*, 2012 WL 4038526, at *18 (reversing this ground where the mother "faced daunting challenges on many fronts," having lost custody and/or parental rights to seven previous children and failed a prenatal drug screen as to her eighth child, with significant trauma and mental health issues, substance addiction, a criminal record, no education beyond a GED, no driver's license, meager employment, and a history of inappropriate relationships, emphasizing that the parent's *efforts* under such difficult circumstances must be considered).  We reverse this ground for termination.

### 3.    Persistent Conditions

The next ground for consideration is persistent conditions.  When the petition was filed in this case, the termination statute provided that this ground for termination applied when:

> (3) The child has been removed from the home of the parent . . . by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
> (C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3) (2018).  Each element must be proven by clear and

convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

"Termination on this ground prevents a child from lingering in uncertainty as a foster child if his or her parent cannot demonstrate an ability to provide a safe and caring environment for the child within a reasonable time." *In re Leroy H.*, No. M2017-02273-COA-R3-PT, 2018 WL 3700917, at *10 (Tenn. Ct. App. Aug. 3, 2018) (citing *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). Recognizing that children need a permanent stable environment, "the question is the likelihood that the child can be safely returned to the custody of the parent, not whether the child can safely remain in foster care with periodic visits with the parent." *In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at *8 (Tenn. Ct. App. May 31, 2017). This ground for termination focuses on the *results* of the parent's efforts at improvement rather than the mere fact that he or she has made them. *In re Abigail F.K.*, 2012 WL 4038526, at *20 (citing *In re Audrey S.,* 182 S.W.3d at 873-74). "While [the parent's] efforts are part of our analysis on substantial noncompliance with the permanency plan, the ground of persistent conditions focuses on whether the parent's efforts have been fruitful[.]" *Id.*

Initially, we note that the children were removed from Mother's home by the requisite order in the dependency and neglect proceeding more than six months before the petition was filed. Regarding the next element, we conclude that the conditions that led to removal still persist and prevent the safe return of the children to the care of the parent. At the time of trial, after seventeen months, Mother was still battling her addiction and mental health issues. She admitted that she needed "more time to get myself together for my children," explaining that she expected her drug treatment to be "a 12-month process before and then it is a 12-month process after that – to be able to show and maintain that I'm able and have the capability to take care of these children." Although Mother claimed that she had been working on the program for six months, she tested positive for multiple substances just two months before trial. She also admitted that she was still struggling with her "grieving and trauma" and "a lot of issues that I'm working on." As Mother's own testimony demonstrates, there is little likelihood that these conditions will be remedied at an early date so that the children can be safely returned to the parent in the near future. Continuing the parent-child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home. We affirm the trial court's ruling that this ground for termination was sufficiently proven by clear and convincing evidence.

### 4.    Ability and Willingness to Assume Custody

The final ground we must address is a relatively new addition to the termination statute. It applies when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial

responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).

Initially, there was a "split in authority" as to how the first element was proven. *See In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9 (Tenn. Ct. App. Oct. 29, 2018). "In *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), a panel of this Court concluded that the first prong of the statute requires the petitioner to prove both an inability *and* an unwillingness of the parent to assume custody or financial responsibility for the child." *Id.* Because the parents at issue *wanted* custody, this negated a required element of the ground. *In re Ayden S.*, 2018 WL 2447044, at *7.

Another panel of this Court respectfully disagreed with that approach in *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018), holding, instead, that

[T]he first prong of Tennessee Code Annotated § 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child.

Stated differently, "the parent must have 'manifest[ed], by act or omission, an ability <u>and</u> willingness.' " *Id.* at *13 (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

Recently, members of this panel have endorsed the latter approach adopted in *In re Amynn K. See, e.g., In re Nevaeh B.*, No. E2019-01539-COA-R3-PT, 2020 WL 1527001, at *7-8 (Tenn. Ct. App. Mar. 31, 2020); *In re H.S.*, 2020 WL 1428777, at *10 ("After careful consideration of the conflicting authorities, we accept DCS's invitation to follow the holding of *In re Amynn K.*"); *In re Jayda H.*, No. E2019-00855-COA-R3-PT, 2019 WL 6320503, at *9 (Tenn. Ct. App. Nov. 25, 2019) ("[C]onsistent with the discussion in the *In re Amynn K.* decision, we do not view a parent's demonstration of 'willingness' as fatal to this ground when accompanied by a failure to manifest the requisite 'ability.' "). *See also In re Bentley Q.*, No. E2019-00957-COA-R3-PT, 2020 WL 1181804, at *10 (Tenn. Ct. App. Mar. 11, 2020); *In re Serenity S.*, No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *16 (Tenn. Ct. App. Jan. 31, 2020); *but see In re Neveah M.*, No. M2019-00313-COA-R3-PT, 2020 WL 1042502, at *16 (Tenn. Ct. App. Mar. 4, 2020) (following *In re Ayden S.* with one judge concurring in results only) *perm. app. granted* (Tenn. June 15, 2020).

We also find guidance in our supreme court's decision in *In re Bernard T.*, 319 S.W.3d 586, 604 (Tenn. 2010), wherein the Court considered a similar ground for termination, applicable to putative fathers, which applies when "[t]he person has failed to manifest an ability and willingness to assume legal and physical custody of the child[.]" Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv). The Court affirmed termination under this ground where the father had "manifested a commendable willingness to assume legal custody of all the children" but "conceded that he was unable to support the children financially and that he could not provide them with a stable residence." *Id.* According to the Court, "This testimony alone provide[d] clear and convincing evidence that [the father] [did] not presently have the ability to assume legal and physical custody of any of the children." *Id.* at 604-05. *See also In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (examining the legislative history of the statute and concluding that it clearly supported "the *Amynn K.* interpretation" of section 36-1-113(g)(14)).

Applying the interpretation in *In re Amynn K.*, DCS was required to prove that Mother "failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child." 2018 WL 3058280, at *14. Clearly, in this case, Mother failed to manifest an ability to personally assume legal and physical custody of the children. Despite her efforts, she had not been able to overcome her drug addiction and mental health issues by the time of trial. She tested positive for methamphetamine, amphetamine, and marijuana just two months before trial. Mother asked to continue working on the twelve-step program, but, by her own estimations, it would take at least another eighteen months. Mother was expecting another child and faced numerous obstacles. Mother's counsel conceded during closing argument that Mother was "not holding herself out, whether it be her physical residence or her current position, to say I'm ready at this exact moment in time to take over parenting these children. I'm sure she would love to do that, but she's not saying that, and she's just asking for more time to continue to work the plan." Her actions have not demonstrated an ability to personally assume custody of Edward and Nathaniel.

Under these circumstances, the second prong of the statute is also met – placing the children in Mother's legal and physical custody would pose a risk of substantial harm to the children's physical or psychological welfare. Her unresolved issues with drug addiction and mental health present "'a real hazard or danger that is not minor, trivial, or insignificant.'" *In re Braelyn S.*, 2020 WL 4200088, at *17 (quoting *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018)). This harm is "'sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not,'" and it is "'more than a theoretical possibility.'" *Id.* (quoting *In re Maya R.*, 2018 WL 1629930, at *8). We therefore affirm the trial court's finding that this ground for termination was also proven by clear and convincing evidence.

## B. Best Interest

If at least one ground for termination has been proven by sufficient evidence, "the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is the best interests of the child." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citing *In re Carrington H.*, 483 S.W.3d at 523). Tennessee Code Annotated section 36-1-113(i) lists nine statutory factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

We must bear in mind that the child's best interest is viewed from the child's perspective rather than the parent's perspective. *In re Gabriella D.*, 531 S.W.3d at 681. "'[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.'" *Id.* (citing Tenn. Code Ann. § 36-1-101(d)).

Considering the statutory factors, Mother has not adjusted her circumstances so as

to make it safe and in the children's best interest to be in her home. *See* Tenn. Code Ann. § 36-1-113(i)(1). Even though DCS's efforts to establish a suitable home during the relevant timeframe did not exceed those of Mother, she has received some assistance from social services agencies, including DCS and CPS caseworkers, both prior to and after the children were removed from the home. Even so, she has failed to effect a lasting adjustment in her circumstances. *See* Tenn. Code Ann. § 36-1-113(i)(2). Mother has maintained regular visitation with the children. *See* Tenn. Code Ann. § 36-1-113(i)(3). However, her relationship with them is limited to that weekly two-hour visitation, and the children have resided away from Mother's home for the majority of their lives. Edward was sixteen months old when he entered foster care, and Nathaniel was two months old. The children had spent seventeen months in foster care by the time of trial. Mother stated that Nathaniel had only recently stopped "hav[ing] a fit" during visits. *See* Tenn. Code Ann. § 36-1-113(i)(4). Changing their caretakers and physical environment at this point is likely to have a negative impact on their well-being. *See* Tenn. Code Ann. § 36-1-113(i)(5). Mother exposed Nathaniel to drugs in utero. *See* Tenn. Code Ann. § 36-1-113(i)(6). Even though she is attempting to battle her addiction, there is a real risk that the children would be exposed to drug use in Mother's home, considering that she tested positive for meth and other substances just two months before trial. *See* Tenn. Code Ann. § 36-1-113(i)(7). Mother also admittedly has unresolved mental health issues. *See* Tenn. Code Ann. § 36-1-113(i)(8). She provided food and diapers for the children during visits, but there was no evidence that she contributed meaningful financial support. *See* Tenn. Code Ann. § 36-1-113(i)(9).

The only argument Mother raised on appeal concerns the best interest analysis. She argues that the trial court should have given more weight to the fact that she was in a substantially better residence than before and following a twelve-step program with attendance at AA/NA meetings. She also points to the fact that she has maintained consistent visitation with the children. We have considered those facts, and commend Mother for her efforts, but nevertheless find the evidence clear and convincing that termination of Mother's parental rights is in the best interest of the children.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is hereby reversed in part and affirmed in part. Costs of this appeal are taxed to the appellant, Amber R., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE